IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:10-cv-00094-RLV-DSC

| | | |
|---|---|---|
| JOHN YORK, D.O., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| HEALTH MANAGEMENT | ) | |
| ASSOCIATES, INC., and | ) | |
| STATESVILLE HMA PHYSICIAN | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. 34) and Plaintiff's Motion for Partial Summary Judgment (Doc. 36).

## I. BACKGROUND

Plaintiff John York is an orthopedic surgeon. Defendant Health Management Associates, Inc. ("HMA"), is "a premier operator of acute-care medical hospitals." As a hospital management organization, HMA's activities through its subsidiaries include physician recruitment. HMA subsidiaries operate multiple facilities within North Carolina, including Davis Regional Medical Center in Statesville ("Davis Regional"). HMA's subsidiary and codefendant, Statesville HMA Physician Management, LLC ("SHPM"), is the successor, by statutory conversion in 2008, to Statesville HMA Physician Management, Inc., with which Plaintiff entered into an allegedly breached employment agreement. Plaintiff believes SHPM serves as an agent of HMA by contracting with physicians recruited by HMA in order to help staff HMA-operated hospitals in

1

North Carolina.

In the fall of 2006, Plaintiff, while maintaining a solo medical practice in Scottsdale, Arizona, was in contact with a recruiter. After a series of discussions with this recruiter and the CEO and COO of Davis Regional, then Karen Metz and John Phillips, respectively, Plaintiff agreed to close his Scottsdale practice and move to Statesville, North Carolina, in order to help open and develop a practice associated with Davis Regional under the name "Statesville Orthopedic & Sports Medicine" ("SOSM").

On January 25, 2007, Plaintiff entered into the Physician Employment Agreement ("Agreement") with SHPM, but the contract was not to take effect until June 1, 2007. An addendum to the Agreement extended the effective date to July 16, 2007. (Doc. 1-1 at 24.)

Following the signing of the Agreement, Plaintiff worked with HMA personnel to complete and submit the required paperwork for his medical-license application to the North Carolina Medical Board. During the early summer of 2007, Plaintiff moved his family to Statesville, North Carolina, where he worked to perform certain duties under the Agreement while awaiting the approval of his medical-license application. These duties included setting up the SOSM office, meeting with referrals, and marketing the new practice. Under the Agreement, Plaintiff was to be paid $515,000 a year as a base salary. (Doc. 1-1 at 13.) He was also to be paid $15,000 for relocation expenses (Doc. 1-1 at 18–19) and $60,000 as a commitment bonus to assist in the purchase of malpractice tail insurance coverage, the repayment of which would be completely forgiven upon fulfillment of "the complete term of [the A]greement" (Doc. 1-1 at 20). No payment was made to Plaintiff, who instead financed his coverage through an equity loan against his home in Scottsdale.

In August 2007, Mr. Phillips informed Plaintiff that payments would be made pursuant to the Agreement only upon licensure. Plaintiff continued to pursue his medical license but contends that the "Board, without just cause, continued to delay approval of his application." In late September, the North Carolina Medical Board sent to Plaintiff a letter explaining his opportunity to withdraw his application for a medical license. (Doc. 35-4.) Plaintiff was instructed to withdraw his application, in writing and within ten days of receiving the letter, or the Board would formally deny the application. (Doc. 35-4 at 2.)

Thereafter, SHPM retained counsel, under a retainer agreement signed by Plaintiff, to represent Plaintiff in an effort to persuade the Medical Board to reconsider its decision. In the retainer agreement, it was noted that "York has an employment agreement with Statesville H.M.A. that is contingent upon his being able to obtain his license to practice medicine in North Carolina." (Doc. 35-7 at 2.)[1] Ultimately, however, in November 2007, "frustrated and facing financial ruin," Plaintiff withdrew his medical-license application. Plaintiff York subsequently filed the Complaint in this case asserting breach of contract against Defendants HMA and SHPM.

Defendants here renew their argument that Plaintiff's medical licensure was in fact a condition precedent to their performance under the Agreement. In addition to writings and deposition testimony addressing the parties' understandings during the course of negotiations regarding Plaintiff's licensure, much offered by partisan witnesses, Defendants proffer Plaintiff's affirmation of licensure as a condition precedent within the retainer agreement created to advance

---

[1] This agreement replaced an earlier draft, signed only by Plaintiff, which describes Plaintiff as "employed by Statesville Orthopedics & Sports Medicine . . . ." (Doc. 35-5 at 2.)

3

his license application. (Doc. 35-7.) Defendants further argue that HMA should be dismissed due to its noninvolvement in the formation of the Agreement. (Doc. 35 at 23–24.)

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial responsibility of informing the district court of the basis for its motion and identifying those particular portions of the record before the Court that the movant believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the event this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. Thus, the nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a motion for summary judgment, the Court must view the evidence and any reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

In its Order denying Defendants' Motion to Dismiss, the Court, in light of the requirement that the provisions of a contract "not be construed as conditions precedent in the absence of language clearly requiring such construction," interpreted the plain language of the contract as creating "a covenant for Plaintiff to obtain a[ medical] license, with the implication that it must be done within a reasonable period of time to avoid a breach of contract," rather than a condition precedent. (Doc. 15 at 6) (quoting *Harris v. Stewart*, 666 S.E.2d 804, 808 (N.C. 2008)). Here, Defendants would have the Court reconsider this position in light of parol evidence and a collateral agreement, the retainer agreement, indicating that the parties in fact understood the contract's licensure requirement as a condition precedent to Defendants' duty to perform. In light of this condition precedent and because Plaintiff failed to obtain a North Carolina medical license, Defendants argue that they have no obligation to compensate Plaintiff under the Agreement and are therefore entitled to judgment as a matter of law. On the other hand, Plaintiff, in arguing that no such condition precedent existed and further that any parol evidence to the contrary may not be considered under North Carolina law, moves for summary judgment on the issue of Defendants' liability for breach of the Agreement, leaving the matter of damages for the jury's consideration. The threshold issue presented is thus whether the parol evidence rule ("PER") bars Defendants' evidence of Plaintiff's medical licensure as an unsatisfied condition precedent to Defendants' performance under the Agreement.

The PER is a rule of substantive law,[2] which renders incompetent certain prior or

---

[2] Though historically treated in North Carolina as a rule of evidence, James H. Chadbourn & Charles T. McCormick, *The Parol Evidence Rule in North Carolina*, 9 N.C. L. Rev. 151, 152 & n.4 (1931), the PER has been recognized by the State's courts of appeals as a substantive rule

5

contemporaneous agreements relating to a written contract intended by the parties to be final as to one or more of its terms. *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 617 S.E.2d 664, 670 (N.C. Ct. App. 2005) (quotation omitted). As regards the PER's application, "[i]n virtually every jurisdiction, one finds irreconcilable cases, . . . confusion, and cries of despair," Eric A. Posner, *The Parol Evidence Rule, the Plain Meaning Rule, and the Principles of Contractual Interpretation*, 146 U. Pa. L. Rev. 533, 540 (1998),[3] and North Carolina's iteration of the rule offers no asylum, having recently been described as "deteriorated to a state of chaotic unpredictability," Brown, *supra*, at 1703. Nonetheless, the Court is guided by general principles articulated by the state courts sufficient to resolve the issue here presented. *Cf. Smith v. Cent. Soya of Athens, Inc.*, 604 F. Supp. 518, 523 (E.D.N.C. 1985) (Fox, J.) ("[I]t is impossible to reconcile all of the statements of the parol evidence rule contained in North Carolina cases . . . .").

First, the Court must determine whether the parties' contract has been reduced to a writing intended by the parties to be final as to one or more of its terms, that is, whether the contract has been "integrated." *Id.* at 524; Restatement (Second) of Contracts § 209; Brown, *supra*, at 1722. In making this determination, the Court may consider extrinsic evidence. Restatement (Second) of Contracts § 209(2). Here, the employment contract is a formal

---

of contract law, and its supreme court "has been sending tacit signals of acquiescence by pointing (correctly) to irrelevance as the basis for refusing to admit extrinsic evidence under the PER," Caroline N. Brown, *North Carolina Common Law Parol Evidence Rule*, 87 N.C. L. Rev. 1699, 1707 (2009) (footnote omitted).

[3] Professor Posner is hardly the first to have noted the confusion attending the PER. *See, e.g.*, James Bradley Thayer, *A Preliminary Treatise on Evidence at the Common Law* 390 (1898) ("Few things are darker than this, or fuller of subtle difficulties.").

agreement, carefully considered and drafted, and particularly in light of a merger clause and a no-oral-modification clause, it is evident that the parties planned no further negotiations as to the contract's express terms and that they intended the writing to trump all prior negotiations as to those terms. This contract is clearly intended by the parties to be final as to the terms contained therein.

Second, the Court must determine whether the integration is complete or only partial. Where a finding of integration bars extrinsic terms that contradict the contract, a finding of *complete* integration also bars supplementary extrinsic terms. *See Rowe v. Rowe*, 287 S.E.2d 840, 845 (N.C. 1982) ("If the [final ]writing supersedes only a part of the transaction, it is a partial integration and other portions of the transaction may be shown by parol evidence.").[4] To ascertain whether an integration is complete or partial under North Carolina law, courts generally look to the case of *Neal v. Marrone*, 79 S.E.2d 239 (N.C. 1953), and whether "the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty." *Smith*, 604 F. Supp. at 525 (quoting *Neal*, 79 S.E.2d at 242). If so, under *Neal*'s standard,

> "it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing." [*Neal*, 79 S.E.2d at 242].
> This approach reflects the view that situations will often arise in which the writing, on its face, clearly embodies the sum total of the parties' agreement. In these instances, further inquiry beyond the terms of the contract is not required.

---

[4] It remains true that "though the North Carolina court often states the parol evidence rule in its traditional form as a bar to any prior or contemporaneous agreement which 'adds to, varies, or contradicts' the writing, the rule actually applied here in many cases seems to allow parol evidence which adds to the writing without contradicting it." John P. Dalzell, *Twenty-Five Years of Parol Evidence in North Carolina*, 33 N.C. L. Rev. 420, 428 (1955) (footnote omitted); *accord* Brown, *supra*, at 1727, 1738–43 (citing *Cananwill, Inc. v. EMAR Group, Inc.*, 250 B.R. 533, 547 (M.D.N.C. 1999).

> By the same token, when the terms of the writing are not so definitive, then implicitly, the court must view the surrounding circumstances to ascertain the intent of the parties with regard to whether the writing was meant to be a total integration.

*Id.*

The court in *Neal* speaks of an implicit agreement, which appears to arise not from the facts of the transaction but rather solely from the writing itself, "to be bound by the meaning attributed by the court to the writing and by no terms outside it," establishing "completeness by presumption." Brown, *supra*, at 1743–44. In the exercise of this presumption,

> [t]he legal effect of a final instrument which defines and declares the intentions and rights of the parties cannot be modified or corrected by proof of any preliminary negotiations or agreement, nor is it permissible to show how the parties understood the transaction in order to explain or qualify what is in the final writing, in the absence of an allegation of fraud or mistake or unless the terms of the instrument itself are ambiguous and require explanation.

*Root v. Allstate Ins. Co.*, 158 S.E.2d 829, 837 (N.C. 1968) (quoting *Orion Knitting Mills v. U.S. Fid. & Guar. Co.*, 50 S.E. 304, 305 (N.C. 1905)).

In light of this presumption, and given the appearance and content of the employment contract as "the sum total of the parties' agreement," it is completely integrated; under the law of North Carolina, it would be error for the Court to look further to extrinsic evidence for the purpose of determining the extent of the writing's integration.[5] Although the Agreement left the

---

[5] Defendants cite a number of cases in furtherance of their argument that the PER "does not bar the admission of evidence proving the existence of an otherwise silent condition precedent." (Doc. 35 at 18–19) (citing *Bailey v. Westmoreland*, 112 S.E.2d 519 (N.C. 1960) (admitting evidence that the promissory note was not to become a binding obligation unless the plaintiff received a certain sum from the sale or collection of another note); *Stachon & Assoc. v. Broadcasting Co.*, 241 S.E.2d 884 (N.C. Ct. App. 1978) (addressing notes executed on the unstated condition that the plaintiff would perform certain work for the defendant); *Perry v. Trust Co.*, 40 S.E.2d 116 (N.C. 1946) (addressing notes executed upon the parties' understanding that the plaintiff's uncle would pay back taxes on a certain parcel of land)). As has long been noted in North Carolina, and elsewhere,

time of Plaintiff's performance uncertain, as discussed in the Court's prior Order, the law implies the missing terms: Plaintiff is afforded a "reasonable time" to obtain his medical license, and in light of the language of the whole instrument and the law's disfavor of conditions precedent, this "reasonable time" is not confined to a time preceding Defendants' obligations to perform. (Doc. 15 at 5–8.) Such terms are deemed to be integrated. *See Johnston v. McRary*, 50 N.C. (5 Jones) 369, 371 (1858) (suggesting that parol testimony would be inadmissible to "add to" the writing, which included an implied-in-law term regarding time of performance).

However, as indicated in *Root*, the PER's notion of "completeness" sensibly bends to standards of interpretation. That is, the ambiguity of a term, even if that term is found within a writing completely integrated under North Carolina law, may usher in explanatory extrinsic evidence. *Cf. Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965) ("Even though a contract may be integrated, if its terms are ambiguous parol evidence may be admitted." (citing Restatement (First) of Contracts § 230)). Therefore, if the term implied by law—that Plaintiff has a "reasonable time" to obtain his medical license—is ambiguous, extrinsic evidence of the parties' mutual understanding as to when Plaintiff was to obtain his

---

> [p]romissory notes are not generally subject to the parol evidence rule to the same extent as other contracts. Parties drawing such instruments tend to follow a rather definitely standardized form. If collateral terms and conditions had been agreed upon, they may be omitted from the note itself to insure its negotiability. Accordingly, it is rather common for a promissory note to be intended as only a partial integration of the agreement in pursuance of which it was given, and parol evidence as between the original parties may well be admissible so far as it is not inconsistent with the express terms of the note.

*Borden, Inc. v. Brower*, 199 S.E.2d 414, 419 (N.C. 1973) (citing 3 Arthur L. Corbin, *Corbin on Contracts* § 587 (1960); 2 Henry Brandis, *Stansbury's North Carolina Evidence* § 256 (1973); Dalzell, *supra*, at 432–33). Even if final, being only partially integrated, such promissory notes may be supplemented, but not contradicted, by extrinsic evidence, in contrast with the completely integrated writing here at issue.

9

license may be considered.

While "[t]here is virtual unanimity in North Carolina that a finding of ambiguity is required, as by Williston's approach, before extrinsic evidence is admissible to construe or interpret the meaning of the terms of a final written contract . . . , analysis of what the courts actually do reveals a mixture of approaches, with many cases utilizing a test of ambiguity that rests upon assessment of the meanings actually given to the term by each party." Brown, *supra*, at 1750–51 (citing *Cox v. Cox*, No. 06-873, 2007 WL 2244671, at *3 (N.C. Ct. App. Aug. 7, 2007) (holding, in a case involving a consent judgment, that the court was not limited to the four corners of the agreement but should take into account the controversy, purpose, and events involved in the litigation)). "Such cases show an admixture of a strong influence from Corbin and the Restatement (Second) of Contracts to mitigate the effects of the 'plain meaning' standard." *Id.* at 1751.

Where a completely integrated contract leaves "the time of performance open and uncertain," and where the extrinsic evidence is offered "to make certain, what was otherwise indefinite," such evidence may be admitted "to explain and elucidate what the parties meant by reasonable time, implied in the written terms . . . ." *Johnston*, 50 N.C. (5 Jones) at 371. In so concluding, the state supreme court essentially deemed such an implied-in-law provision "ambiguous," thereby admitting proof of the parties' actual, and not merely presumed, agreement as to relative times of performance. Although the state courts could have admitted such evidence by deeming such an agreement only partially integrated, as other states have done,[6] this result is

---

[6] Helen Hadjiyannakis, *The Parol Evidence Rule and Implied Terms: The Sounds of Silence*, 54 Fordham L. Rev. 35, 40 n.32 (1985) (citing *Kansas City Bridge Co. v. Kansas City Structural Steel Co.*, 317 S.W.2d 370, 373 (Mo. 1958) (applying the rule of partial integration

consistent with underlying authority and mitigates the bluntness of North Carolina's presumption

of completeness.[7]

Finally, circumstances pose one final hurdle to consideration of Defendants' extrinsic

evidence: the Agreement's merger clause.[8] "North Carolina recognizes that merger clauses are

---

and deeming the actual agreement to prevail over the reasonable-time rule), and *Brazil v. Dupree*, 254 P.2d 1041, 1045 (Or. 1953) (considering evidence of an oral agreement where no time of performance was mentioned in the writing and consequently deeming as unintegrated the implied-in-law term)); *see also Mitchill v. Lath*, 160 N.E. 646, 649 (N.Y. 1928) (Lehman, J., dissenting) ("To determine what the writing was intended to cover, 'the document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered.'" (quoting 5 John Henry Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* § 2430 (2d ed. 1923))); Restatement (First) of Contracts § 240(1)(b) ill. 4–5 (deeming the time for performance a naturally omitted term, which, if consistent with the writing, may be proved by extrinsic evidence, even if the writing is otherwise completely integrated).

[7] Indeed, "Williston severely criticized the cases that, under the four corners approach, read in the rule of law 'reasonable time' in order to exclude proof of the actual agreement." Hadjiyannakis, *supra*, at 46 (citing 4 S. Williston, *A Treatise on the Law of Contracts* § 640, at 1054–60 (3d ed. 1961)) (noting further that proof of an agreed completion date, the admission of which was endorsed by Williston, would otherwise fail Williston's "naturalness" test); *cf. Kansas City Bridge*, 317 S.W.2d at 375 ("'[W]hen an ordinary contract does not state the time for performance, and the parties orally agree on a particular time,' the legal implication that they intended a reasonable time is an implication 'fictitiously invented by the law.'" (quoting 3 S. Williston, *A Treatise on the Law of Contracts* § 640, at 1840 (3d ed. Jaeger rev. 1963))).

[8] The clause reads as follows:
<u>Entire Agreement</u>. You acknowledge that this Agreement and any properly executed corrections, amendments and addenda (all of which are incorporated by reference herein), incorporate adequately, completely, and entirely this Agreement between the parties setting out all of the terms, compensation, inducements, and benefits offered to you by us, and there are no others beyond or in addition to those stated in this Agreement. Any promises, inducements, or benefits of any kind or nature made or alleged to have been made by any agent or employee of us or the Hospital to you or to any representative or agent of you and not specifically written in this Agreement, won't have any force and effect whatsoever, and you agree that you haven't relied upon such promises, inducements, or benefits in executing this Agreement.

11

valid contractual provisions[,] and the courts consistently uphold their use." *Mech. Sys. & Servs., Inc. v. Carolina Air Solutions, L.L.C.*, No. 02-8572, 2003 WL 22872490, at *6 (N.C. Super. Dec. 3, 2003) (citing *Zinn v. Walker*, 361 S.E.2d 314, 318 (N.C. Ct. App. 1987)). The primary purposes of such clauses is "to effectuate the policies of the Parol Evidence Rule," that is, "barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing." *Zinn*, 361 S.E.2d at 318. However, "[w]here giving effect to [a] merger clause would frustrate and distort the parties' true intentions and understanding regarding the contract, the clause will not be enforced." *Id.* For this exception to apply, "the parol evidence [must not be] markedly different, if at all, from the written contract . . . ." *Id.* at 319.

Here, Defendants' evidence of Plaintiff's affirmation of his licensure as a condition precedent supports the conclusion that, despite the employment contract's merger clause, the parties did not intend the employment contract to constitute their entire agreement. Moreover, the implied agreement as to licensure is not "markedly different" from the express terms of the Agreement. Accordingly, the merger clause will not bar admission of pertinent extrinsic evidence.

In sum, the Court deems the implied term "ambiguous" under North Carolina law, and therefore, Defendants' extrinsic evidence of Plaintiff's medical licensure as a condition precedent to their own performance obligations may be considered. In light of this evidence,[9] what

---

(Doc. 1-1 at 11.)

[9] Defendants offer the retainer agreement (Doc. 35-7) as an affirmation of the parties' earlier-established understanding of Plaintiff's licensure as a condition precedent rather than as a subsequent agreement that changed or modified the original understanding, to which the PER would not apply, *see, e.g.*, *Acme Mfg. Co. v. McPhail*, 106 S.E. 672, 674 (N.C. 1921) ("The principle excluding parol evidence has no application to subsequent agreements which change or

constitutes a "reasonable time" may indeed be limited to some time frame preceding Defendants' performance, though in light of the contract's language and the fact that much of Defendants' extrinsic evidence is either partisan or regards then-ongoing contractual negotiations, this is not necessarily the case. Therefore, the contract being ambiguous, its meaning is a matter to be submitted to the jury.[10] *Root*, 1258 S.E.2d at 590.

---

modify the original contract . . . .").

[10] Defendants' estoppel-based theories does not spare their case from the jury's consideration. In North Carolina, the doctrine of equitable estoppel applies
> when any one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

*Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 881 (N.C. 2004) (quoting *State Highway Comm'n v. Thornton*, 156 S.E.2d 248, 258 (N.C. 1967)). In arguing that Plaintiff should be estopped from here denying the existence of the condition precedent, Defendants essentially presume the absence of a genuine issue of material fact as to the contractual terms upon which the parties mutually agreed. But if Defendants ultimately consented to Plaintiff's licensure requirement as a covenant to be satisfied within a reasonable time, it could no longer have been Defendants' belief that the licensure requirement was instead treated as a condition precedent, even though that was the assumption though much of the preliminary negotiations. (*See, e.g.*, Doc. 35-2 at 3) ("Dr. John York intends to accept the position with Davis Regional . . . . Pending Licensure and Credentialing."). As already indicated, the truth of this matter is for the jury to find.
> In addition, under the branch of equitable estoppel known as "quasi-estoppel," a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument. . . . The key distinction between quasi-estoppel and equitable estoppel is that the former may operate without detrimental reliance on the part of the party invoking the estoppel. . . . In comparison to equitable estoppel, quasi-estoppel is inherently flexible and cannot be reduced to any rigid formulation.

*Whitacre P'ship*, 591 S.E.2d at 882 (citations omitted). Defendants argue that the inclusion of the term "York has an employment agreement with Statesville H.M.A. that is contingent upon his being able to obtain his license to practice medicine in North Carolina" within the retainer agreement, signed by Plaintiff, bars Plaintiff per quasi-estoppel from here asserting otherwise. Quasi-estoppel, however, would preclude Plaintiff, after retaining the benefits of legal representation, from avoiding any obligations or burdens imposed under that agreement. Here,

However, the matter of HMA's liability may be decided here. "Ordinarily, a corporation retains its separate and distinct entity where its stock is owned partly or entirely by another corporation." *Hucki-Bilt, Inc. v. First Citizens Bank & Trust Co.*, 157 S. E. 2d 352 (N.C. 1967) (citations omitted). Even where one corporation owns all the capital stock of another corporation, and the members of the board of directors of both corporations are the same, "nothing else appearing, [these facts are] not sufficient to render the parent corporation liable for the contracts of its subsidiary. In order to establish liability on the part of the parent corporation on such contracts there must be additional circumstances showing fraud, actual or constructive, or agency." *B-W Acceptance Corp. v. Spencer*, 149 S.E.2d 570, 575–76 (N.C. 1966) (citing *Whitehurst v. FCX Fruit & Vegetable Serv.*, 32 S.E.2d 34, 40 (N.C. 1944)). Plaintiff, otherwise offering little with regard to the nature of HMA's relationships with the subsidiaries here at issue, has put forth a letter from Craig Dunker, "Director, Physician Practice Management," perhaps at HMA, which discusses Plaintiff's "Employment Agreement with HMA." (Doc. 39-6 at 2.) While Defendants have in response offered only the unsupported assertion that Mr. Dunker was an employee of Hospital Management Associates, Inc. (Doc. 41 at 8), an entity distinct from HMA, the letter was authored after Plaintiff signed the Agreement, and Plaintiff neither argues how Mr. Dunker may have been involved in the negotiations of the Employment Agreement so as to establish apparent agency nor offers additional evidence adequate to establish actual agency. *See*

---

the term at issue is listed under the heading "Background," a section distinct from the agreement's "Terms," and while relevant to the finder of fact in discerning the substance of the parties' contract, it is not clear that the retainer agreement imposed upon plaintiff the clarification or concession of his status as a non-employee such that denial here of his licensure as a condition precedent would be "clearly inconsistent" with the agreement. *See B & F Slosman v. Sonopress, Inc.*, 557 S.E.2d 176, 181 (N.C. Ct. App. 2001) (describing the doctrine's "essential purpose").

*Foote & Davies, Inc. v. Arnold Craven, Inc.*, 324 S.E.2d 889, 892 (N.C. Ct. App. 1985) (articulating the instances under which a principal may be liable upon a contract with a third party per agency theory). Therefore, the claim against HMA shall be dismissed at this time.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment (Doc. 34) be **GRANTED** in part and **DENIED** in part. Plaintiff's claim against Defendant HMA is hereby dismissed.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 36) be **DENIED**.

Signed: February 20, 2013

Richard L. Voorhees
United States District Judge